**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

———————————————————————
)
**FEDERAL DEPOSIT INSURANCE** )
**CORPORATION AS RECEIVER FOR** )
**BENCHMARK BANK,** )
)  **Case No.**
                      **Plaintiff,** )
**v.** )
)  **JURY DEMANDED**
**RICHARD SAMUELSON; JOHN** )
**MEDERNACH; JOSEPH DEPAULO;** )
**RICHARD HANSEN; DEAN KELLEY; and** )
**FRED T. L. NORRIS,** )
)
                   **Defendants.** )
———————————————————————)

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Benchmark Bank (the "FDIC-R"), for its Complaint, states as follows:

1.     FDIC-R brings this case in its capacity as Receiver for Benchmark Bank ("Benchmark" or "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821. Defendants are six former Directors and/or Officers of Benchmark who breached their duties of care by approving certain high-risk acquisition, development, and construction ("ADC") loans and commercial real estate ("CRE") loans (the "ADC/CRE Lending Program"). FDIC-R seeks to recover losses of at least $13.3 million caused by Defendants' gross negligence, negligence, and breaches of fiduciary duties.

2.     At all relevant times, Benchmark's primary lending strategy was to grow rapidly its ADC/CRE Lending Program under the leadership of Richard Samuelson ("Samuelson"). Samuelson was Chairman of the Bank's Board of Directors, the principal originator of the

Bank's ADC/CRE loans, a member of the Directors' Loan Committee ("DLC") that approved the loans, and Acting President of the Bank with ultimate responsibility for the underwriting and credit administration of these loans.

3.     Defendants, in their capacity as members of the DLC or as loan officers, approved 11 ADC/CRE loans that Samuelson originated between September 2005 and April 2008 without obtaining the information necessary to become sufficiently informed to make an independent business decision about the prudence of each loan, even though it was apparent that the loans had not undergone adequate scrutiny.  As a result, Defendants caused the Bank to finance ADC/CRE projects without analysis of their economic viability or a complete evaluation of the creditworthiness of borrowers and guarantors, including, for example, consideration of the other loans those borrowers and guarantors had with Benchmark and other lenders.

4.     The Bank's ADC/CRE loan concentration grew too large and too quickly for a bank of Benchmark's size and staffing, leaving it dangerously over-exposed to the volatile CRE market.  This appetite for growth required Benchmark to scramble for deposits to fund its multi-million-dollar ADC/CRE loans, often resorting to non-core deposits, such as brokered deposits or internet CDs, which carried a high cost of funds.  Even when the real estate market declined, Defendants continued to pursue their failed ADC/CRE Lending Program, exacerbating the Bank's problems by making new loans and renewing existing troubled loans, rather than curtailing ADC/CRE lending, working out troubled loans, and preserving what was left of Bank capital to absorb losses when poorly underwritten ADC/CRE loans went bad.

5.     Benchmark failed on December 4, 2009.  As a result of Defendants' negligence, gross negligence, and breaches of fiduciary duty, Benchmark suffered damages of at least $13.3 million.

2

## THE PARTIES

**Plaintiff**

6. Plaintiff is the Federal Deposit Insurance Corporation as Receiver for Benchmark, pursuant to 12 U.S.C. § 1811, *et seq.* The FDIC was appointed Receiver on December 4, 2009, following the closure of the Bank by the Illinois Department of Financial and Professional Regulation. As Receiver, the FDIC has rights to pursue all of the Bank's claims, including its claims against each of the Defendants here.

**Defendants**[1]

7. Defendant Samuelson established Benchmark Bank, serving as its Chairman of the Board and principal originator of CRE loans from 2000 to February 2009, and as Acting President from January to July 2006, and again from September 2006 to February 2008. Samuelson also served as a member of the DLC, the committee with ultimate authority to approve the loans discussed in Paragraph 30. Samuelson resides in Sugar Grove, Illinois. He was discharged from personal bankruptcy proceedings on November 2, 2010, and as a result, recovery is sought from him only to the extent of available insurance coverage, and not from his personal assets.

8. Defendant John Medernach ("Medernach") served as the Chief Credit Officer of Benchmark from August 2006 to February 2009, as Acting President from March 2009 to the Bank's closing, and as a member of the Board of Directors from August 2009 to closing. As

---

[1] Richard Guerard ("Guerard") served as a member of Benchmark's Board of Directors and the DLC from 2000 to August 2009. He recently filed for Chapter 7 bankruptcy protection. Once the automatic stay in Guerard's bankruptcy is lifted, the FDIC-R will seek leave to amend its Complaint to add Guerard as a Defendant.

Chief Credit Officer, he had joint authority with Samuelson to approve loans up to $1.5 million. He resides in Aurora, Illinois.

9.     Defendant Joseph DePaulo ("DePaulo") served as a member of Benchmark's Board of Directors and the DLC from 2000 to July 2009. DePaulo was also a borrower at Benchmark. His construction company received ADC/CRE loans from the Bank, some of which defaulted and caused DePaulo to resign from the Board. He resides in Bolingbrook, Illinois. DePaulo was discharged from personal bankruptcy proceedings on July 27, 2010, and as a result, recovery is sought from him only to the extent of available insurance coverage, and not from his personal assets.

10.     Defendant Richard Hansen ("Hansen") served as a member of Benchmark's Board of Directors and the DLC from 2000 to the Bank's closing. Hansen held an ownership interest in a real estate development corporation that received ADC/CRE loans from the Bank. He resides in Batavia, Illinois.

11.     Defendant Dean Kelley ("Kelley") served as a member of Benchmark's Board of Directors and the DLC from May 2003 to the Bank's closing. Kelley is President of a construction and development company that received ADC/CRE loans from the Bank. He resides in St. Charles, Illinois.

12.     Defendant Fred T. L. Norris ("Norris") served as a member of Benchmark's Board of Directors and the DLC from 2000 to the Bank's closing. He resides in St. Charles, Illinois.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.

14.     The Court has personal jurisdiction over Defendants pursuant to 735 ILCS §§ 5/2-209(a)(1) and (2).

15.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

16.     Benchmark's original charter dates to 1900, and after several purchases and moves, it became known as Benchmark in 2000.  It was wholly-owned by Benchmark Bancorp, a privately-held holding company, and had five branches when it failed.

17.     As Defendants knew, or should have known, ADC/CRE lending is a specialized field with unique risks that require thorough understanding and close management. Management's ability to identify, measure, monitor, and control portfolio risk through effective underwriting policies, systems, and internal controls is crucial to sound ADC/CRE lending.

18.     With the exception of Samuelson, however, Defendants had no experience in ADC/CRE lending.  Their only lending "experience" in this area was as borrowers, with a majority of the Defendants borrowing from Benchmark.

19.     Defendants failed to undertake the analysis necessary to evaluate loans of the size that Samuelson proposed to them, and approved sizable ADC/CRE loans without sufficiently informing themselves and considering information necessary to make independent business decisions.  Moreover, Defendants approved the 11 risky loans when they knew, or should have known, that the Bank lacked the necessary limits and controls to manage these loans.

**Deficiencies in the ADC/CRE Lending Program**

20.     From the outset, the ADC/CRE lending process at Benchmark was fundamentally defective.  When Defendants approved the 11 loans, they knew, or should have known, that the loans required a high degree of scrutiny because the loan origination function, which generated "sales" of new loans, was not segregated from the loan administration function, which included credit analysis and monitoring.  This significant internal control deficiency should have caused Defendants, at a minimum, to apply a more stringent level of review to ensure compliance with its own policies before approving loans.  Instead, Defendants wholly disregarded principles of safety and soundness, approving the loans despite multiple loan violations that made clear that repayment was highly speculative, and in some cases, unlikely.

21.     Defendants knew or should have known that the lack of proper controls was particularly problematic because Samuelson was the principal originator of ADC/CRE loans.  Although the loan administration personnel were nominally charged with analyzing proposed loans, these employees did not have the independence necessary to scrutinize them.  With Samuelson serving as Chairman, CEO, DLC member, and, during key periods, Acting President of the Bank, it was difficult for credit analysts to report underwriting deficiencies to him.  Instead, on loans listed below, in ¶ 30, the credit analysts recommended approval, despite the significant problems with each loan, which were apparent even from information reported in the loan write-ups.  As one employee phrased it, Samuelson "was the Bank," and to disagree with him would be ineffective or, at worst, could cost an employee his or her job.  As Defendant DePaulo acknowledged, "it was [Samuelson's] way or the highway" at Benchmark.

22.     Moreover, Defendants knew or should have known that the loans Samuelson originated required a high degree of scrutiny because Samuelson's compensation included

generous incentive awards for his origination of loans, providing him with additional motivation to ensure that the loans were approved.

23.     Samuelson's loan origination efforts targeted borrowers that he had previously served at a $1 billion institution in the same geographic area.  But Benchmark was far smaller than that bank, holding less than $200 million in assets.  Benchmark did not have the capital necessary to make the high-dollar loans Samuelson's borrowers required.  As a result, Benchmark was forced to enter into participation agreements, under which another financial institution or institutions would buy portions of the loans in order for Benchmark to remain within its lending limit.  Nonetheless, Defendants approved the 11 loans despite the fact that Defendants knew, or should have known, that Benchmark personnel were not equipped to solicit and execute these highly complex participations effectively.

24.     Defendants approved the 11 ADC/CRE loans when they knew, or should have known, that the Bank did not have an effective system to monitor them or work them out if they became troubled.  An ADC/CRE loan requires the lender to monitor the progress of a project and determine whether the percentage of funds disbursed is consistent with the percentage of the project's completion.  When these percentages are not consistent, an out-of-balance condition occurs, and the lender must either decide to lend additional funds to cure the condition, or require borrowers to place additional funds of their own into the project.  Benchmark's tracking procedures were virtually non-existent or meaningless.  Defendants approved renewals of, and increases to, the 11 ADC/CRE loans without analyzing whether the underlying projects were performing as originally projected.

25.     Defendants knew or should have known that under Samuelson's control, ADC/CRE loans moved through the origination, credit administration, and participation

processes without the requisite analysis or documentation. As Defendant DePaulo explained, Samuelson operated "the old fashioned way, a handshake here, a promise here, we will catch up with the paperwork." Yet Defendants approved the 11 ADC/CRE loans without requesting or reviewing underlying documentation for the loans, such as appraisals.

26. In their capacity as members of the DLC or as loan officers, Defendants also approved the 11 ADC/CRE loans when they knew, or should have known, that they violated the Bank's January 2005 Construction Loan Policy limiting concentration of ADC lending to 400 percent of capital. By March 2008, the Defendants had approved all but one of the 11 ADC/CRE loans identified in ¶ 30, which contributed to an ADC concentration of 552 percent of the Bank's Tier 1 capital. This exceeded both regulatory guidance and even the higher limits set in Benchmark's own Loan Policy.

27. Defendants knew, or should have known, that FDIC examiners recommended changes to the Bank's Loan Policy in 2007 that were not made. For example, the Bank's policy incorrectly identified the supervisory loan-to-value ("LTV") limit for improved land as 80 percent, rather than the recommended 75 percent. The policy also failed to require key underwriting data for ADC/CRE loans, such as analyses of the sales absorption period and borrower debt-service ratio. Notwithstanding these deficiencies, Defendants approved the 11 loans without adhering to the regulatory guidance.

28. Defendants also knew, or should have known, that the 11 ADC/CRE loans that Samuelson originated were processed largely without proper internal controls and therefore, required a high level of scrutiny. Defendants, however, approved them without any meaningful scrutiny. As Thomas Bolduc ("Bolduc"), the Bank's fifth president in eight years, wrote in 2008:

8

> Historically, the Chairman operates autonomously from the rest of the Bank with few, if any, checks and balances to his lending decisions, portfolio management and credit administration. No one in the commercial real estate lending process, from analysts to processors to loan committee members questions decisions made by the Chairman. Rather, employees "do what they are told." A lack of checks and balances for *any* lender yields the potential for criticism from regulators and/or external loan review personnel [and] leads to the possibility of loan problems and promotes lending behaviors that may be (and have been) detrimental to the Bank. Furthermore, it is difficult to impact a cultural change in lending practices when the Chairman of the Board, who should be beyond reproach, is in reality, the greatest contributor to the asset quality issues and is resistant to adhering to proper lending disciplines.

Rather than heeding Bolduc's concerns, Defendants continued to approve high-risk, unsafe and unsound loans. Bolduc's employment was terminated in January 2009.

## Defendants' Approval of Certain Loans

29. Under the Bank's Loan Policy, all loans over $1.5 million required the approval of the DLC, which was comprised of the entire Board of Directors. Samuelson and Medernach had authority to jointly approve secured loans up to $1.5 million in aggregate credit. If a borrower had an aggregate debt of $1.5 million or more, any additional funding to that borrower had to be approved by the DLC.

30. Defendants were negligent, grossly negligent, and breached their fiduciary duties to the Bank in approving at least the following 11 loans, which were originated for approximately $28 million and resulted in losses to date of $13.3 million.

| Borrower | Loan Amount | Date | Loss | Approval Votes | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | DePaulo | Hansen | Kelley | Medernach | Norris | Samuelson |
| B&B Properties | $8,500,000 | Sept. 9, 2005 | $3,017,743 | X | X | X | | X | X |
| Vanguard Homes | $4,500,000 | July 18, 2006 | $3,806,087 | X | X | X | | X | X |
| Macom/ Wolf's | $3,400,000 | Aug. 18, 2006 | $1,455,916 | X | X | X | | X | X |
| Macom/ Heggs | $ 725,000 | Aug. 29, 2006 | $ 340,424 | X | X | X | | X | X |
| Macom/ Scotch | $ 800,000 | Mar. 20, 2007 | $1,033,968 | X | Absent | X | | X | X |
| Macom/ Frontier | $ 800,000 | Dec. 18, 2007 | | X | X | X | | X | X |
| KVR Properties | $8,250,000 | May 1, 2007 | $2,576,114 | X | X | X | | X | X |
| | $ 400,000 | May 1, 2007 | | X | X | X | | X | X |
| Borrower A | $ 700,000 | Jan. 1, 2008 | $ 288,100 | | | | X | | X |
| Borrower A | $ 725,000 | Jan. 18, 2008 | $ 725,000 | | | | X | | X |
| Borrower A | $ 75,000 | Apr. 11, 2008 | $ 75,000 | | | | X | | X |
| | | | $13,318,352 | | | | | | |

31.    The 11 loans arose from four loan relationships:  B&B Properties of Illinois ("B&B"); Vanguard Homes ("Vanguard"); Macom Corporation ("Macom"); and KVR Properties, LLC ("KVR") and "Borrower A"[2] (collectively, the "KVR loans").  Defendants failed to consider the risks attendant to these loans, and approved them at a time when the Bank's rapidly growing concentration in CRE loans exceeded regulatory guidance.  By early 2008, these loans also violated limits specified in the Bank's own Construction Loan Policy.  At the time of each approval, the Defendants knew, or should have known, of the Bank's lack of controls.  Had

---

[2]    The names of individual borrowers have been withheld to protect their privacy.  The names of these borrowers will be provided once an appropriate protective order is in place.

Defendants, in their capacity as members of the DLC and as loan officers, made informed credit decisions, these loans would not have been approved or funded.

**B&B Properties Loan**

32.     On September 6, 2005, the DLC, including Samuelson, DePaulo, Hansen, Kelley, and Norris, unanimously approved an $8.5 million revolving development loan to B&B for a 439-lot development in South Elgin, Illinois.  Samuelson proposed the B&B loan. The borrower, B&B Properties, was a single-purpose LLC without any significant assets other than the collateral for the loan.  The stated purpose of the loan was to fund a speculative residential development with no pre-sold lots.

33.     The loan information and documentation ("loan package") that Samuelson presented to the DLC showed that B&B had reported net losses in the three prior fiscal years. Benchmark's credit analyst warned the Defendants that B&B's "[n]et worth is not at a level that would allow any losses without endangering the ongoing concern."  The loan package demonstrated that the credit analysts failed to perform a global financial analysis of the guarantors, who provided stale financial information.

34.     Samuelson, as B&B's loan officer, prepared the B&B loan request and presented it to the DLC for approval.  The request identified 317 acres of land as collateral for the loan and assigned the collateral an $18,135,048 value based on the "total sales price" of developed lots, resulting in a purported LTV ratio of 47 percent.   Other sections of the loan package, however, indicated that the borrower would take title and mortgages on portions of the property in phases, and that "Phase One" covered only 100 acres.  Despite this inconsistency, Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris voted to approve the loan, and the Bank obtained only 100 acres in Phase One – not 317 acres – as collateral.  If Defendants had

questioned the discrepancy, they would have discovered that the actual "as completed" value of the property underlying Phase One was $12,675,000, resulting in an LTV of 67 percent, and learned that the "as is" valuation for the entire property was $9,085,000, resulting in a 94 percent LTV (the "as is" valuation of just the 100 acres actually taken by the Bank necessarily falling even lower, with a resulting LTV well over 100 percent.)

35.     Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris approved at least three renewals of the B&B loan without obtaining updated appraisals that would have revealed the collateral discrepancy.  At the 2008 renewal, Samuelson presented a loan request that represented that the collateral value was nearly double its prior value – increasing the property value to $31,281,994 and lowering the LTV ratio to 27 percent – yet the loan request still cited the original 2005 appraisal of the property as the basis for the valuation.  Defendants DePaulo, Hansen, Kelley, and Norris failed to question the greatly increased collateral valuation, even though the property had not been reappraised and the increase came at a time when the real estate market was in sharp decline.  Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris renewed the loan with little, if any, discussion.

36.     The deficient underwriting, inconsistent and inadequate information, and lack of credit analysis were apparent from the loan package provided to the Defendants.  Had the Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that the sources of repayment were inadequate, the repayment sources identified were speculative and vulnerable to a deteriorating housing market, the borrowers' creditworthiness did not support the loan amount, and the loan should not have been approved.

37.     By year-end 2008, the Bank had determined that it did not have 317 acres as collateral, and the B&B loan thereafter appeared on Benchmark's watch list.  The identified repayment sources were insufficient to repay the loan, although no charge-offs were taken until November 2009.

38.     As a result of the actions and inactions of Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris with respect to the B&B loan, Benchmark and the FDIC-R incurred damages in excess of $3 million.

**Vanguard Homes Loan**

39.     On July 14, 2006, Samuelson sought approval of a $4.5 million ADC loan to Vanguard Homes to finance the development of 43 acres of land in Hinkley, Illinois, into 80 residential lots.  This loan request also sought renewal of a separate $1.5 million revolving line of credit to Vanguard for Hannaford Farms, another large ADC project in which Vanguard Homes was involved, resulting in a total request of $6 million.  The collateral for the $4.5 million Vanguard loan was the undeveloped 43 acres of property, which had not yet been appraised, but which the Defendants approved conditioned on obtaining an appraisal that resulted in a valuation of $5,625,000 and an 80 percent LTV ratio.  Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris unanimously approved this request at the DLC meeting on July 18, 2006.

40.     At approval, Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris failed to obtain critical information that would have allowed them to make an independent business decision, such as information regarding whether Vanguard was able to complete the Hinkley project, given its commitments to the Hannaford Farms project, and whether 80 lots, in this rural

area more than 60 miles from any metropolitan area, were marketable. The project was speculative, with no lots pre-sold.

41.     The loan request also raised serious doubts about the financial viability of Vanguard and the guarantors; it noted that Vanguard only sold one home in 2004 and none in 2005, and that the guarantors' liquid assets "continue to decline annually." The loan request provided for an LTV ratio of 80 percent, even though supervisory guidance for land development was 75 percent. Additionally, the loan request projected costs well in excess of the loan and the borrower's available funds, noting that the general contractor (who was not a borrower on the loan) intended to lend equity to the project. Indeed, the appraisal underlying the loan showed that at the time of the loan, the "as is" value of the property was $1,810,000 resulting in an LTV ration of 249 percent, a "bulk market value" of $6,180,000 resulting in an LTV ratio of 73 percent, and a "prospective" value of $3,020,000 resulting in an LTV ratio of 149 percent. Defendant DePaulo acknowledged that the prospective value figure in the appraisal was a more accurate projection of the as completed value of the property, because it takes into account project costs and discounts for time on the market for each lot.

42.     Vanguard failed to pay its loan obligations, and this loan should have been placed on "non-accrual" and treated as defaulted in April 2007. Instead, on March 30, 2007, Samuelson wrote a $35,000 personal check to Vanguard and deposited it to bring the loan within 60 days past due. Samuelson admitted that when Vanguard paid him back, he did not know the source of the repayment funds, and that it may have been from "a draw that [the guarantor/principal of Vanguard] subsequently did" from the Vanguard loan.

43.     Defendants Samuelson, DePaulo, Hansen, Kelley and Norris renewed the Vanguard loan without ensuring that one of the original conditions it placed on its approval had

been met – a requirement that the borrower submit an executed $1.3 million equity note between the general contractor and the borrower. This equity note was never executed; in fact, the general contractor placed mechanic's liens on the property that ultimately exceeded the value of the project. In renewing the loan, Defendants also relied on the valuation from the original appraisal, which was stale, used unsound comparables, and was based on an unreasonable projection that the unconstructed Vanguard lots would sell to developers at nearly the same price as the median price for a fully-constructed home in the Hinkley area.

44. The deficient underwriting, inadequate information, and lack of credit analysis were apparent from the loan package provided to the Defendants. Had the Defendants on this loan insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate source of repayment, the repayment sources identified were speculative and vulnerable to a deteriorating housing market, the borrowers' creditworthiness did not support the loan amount, and the loan should not have been approved.

45. By August 2008, the Vanguard loan had matured and more than $4 million was outstanding. The identified repayment sources were insufficient to repay the loan, although no charge-offs were taken until March 2009.

46. As a result of the actions and inactions of Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris with respect to the Vanguard loan, Benchmark and the FDIC-R incurred damages in excess of $3.8 million.

**Macom Corporation Loans**

47. In a 16-month period, Defendants Samuelson, DePaulo, Hansen, Kelley and Norris approved four loans to Macom Corporation, a real estate development company, for "working capital." Samuelson's August 24, 2006, loan requests sought approval for a $3.4

million loan to "cash out equity" from two parcels of vacant land at "Wolf's Crossing," and sought $725,000 for a commercial mortgage on property at "Heggs Road." The collateral for the Wolf's Crossing loan was 20 acres of land in Naperville, Illinois, and Defendants approved the loan conditioned on an appraisal that resulted in an 80 percent LTV ratio. The collateral for the Heggs Road loan was 18.5 acres of vacant land in Oswego, Illinois, and the Defendants approved the loan conditioned on an appraisal that resulted in a 65 percent LTV ratio. Samuelson subsequently obtained an appraisal for the Wolf's Crossing property that valued the land at $4,720,000 resulting in an LTV ratio of 72 percent, but he apparently never obtained an appraisal for the Heggs Road property. Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris unanimously approved these loans on August 28, 2006.

48.     On March 14, 2007, Samuelson requested approval of an $800,000 loan to pay off another bank's loan to Macom and to set up an interest reserve to fund payments on the new Benchmark loan. The identified collateral was 70 acres of vacant land at the intersection of "Scotch & Stewart," which was to be pledged by a third party who was not a borrower on the loan. The loan request valued the Scotch & Stewart property at $5.6 million and provided a loan to value ratio of 14 percent, but the only source cited for the collateral value was an appraisal provided by the borrower. Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris unanimously approved the Scotch & Stewart loan on March 20, 2007. That same year, Samuelson requested approval of an additional loan of $800,000 to Macom, which Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris approved as unsecured at the December 18, 2007, DLC meeting.

49.     On the Scotch & Stewart loan, Defendants failed to question or object to Samuelson's advisement that the loan request included a request from the borrower and the land

owner that when the Bank has the "opportunity" it would reduce its collateral to 20 acres. Relying on a this disclosure in the loan request, Samuelson released 50 of the 70 acres of the Scotch & Stewart collateral 18 months after approval, even though the loan was non-performing at the time and should have been placed on non-accrual.

50.     These four Macom loans, totaling $5.725 million, required funding above Benchmark's limit on loans to one borrower.  These loans included "interest carry" provisions that simultaneously funded and paid interest on these loans, even though no improvement or construction of any kind was contemplated.  In addition, the loan packages provided to Defendants noted that the borrower's cash flow was insufficient to service past debts, the borrower's debt-to-tangible-net-worth ratio had significantly deteriorated, and Macom's principal was taking "large cash distributions" on an annual basis.  In light of all of these problems, the LTV ratios on the Macom loans, some of which were never substantiated, were excessive.  Notwithstanding the warnings from the credit analyst and the problems apparent on the face of the loan requests, Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris approved these loans without dissent.

51.     With respect to one of the largest Macom loans (for the Wolf's Crossing property,) a Benchmark credit analyst warned Defendants that the "[u]ltimate repayment source and timeframe for the 19.5 acre parcel has not yet been determined by the Borrower as the property is being held for possible development or sale."  The loan request provided for an LTV ratio of 80 percent, even though supervisory guidance for land development was 75 percent and supervisory guidance for vacant land was 65 percent.  Defendants Samuelson, DePaulo, Hansen, Kelley and Norris approved this loan unanimously.

17

52. Defendants renewed the Macom loans several times, without discussion of the global loan relationship with the borrower, and without information about how these loans would be repaid.

53. The deficient underwriting, inadequate information, and lack of credit analysis were apparent from the loan packages provided to the Defendants. Had the Defendants on these loans insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there were no adequate sources of repayment, the repayment sources identified were speculative and vulnerable to a deteriorating housing market, the borrowers' creditworthiness did not support the loan amounts, and the loans should not have been approved.

54. The Wolf's Crossing, Heggs, Scotch & Stewart, and unsecured Macom loans matured in August 2008, September 2008, December 2008, and June 2008, respectively. The identified repayment sources for each loan were insufficient to repay the loan.

55. As a result of the actions and inactions of Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris with respect to the Macom loans, Benchmark and the FDIC-R incurred damages in excess of $2.8 million.

**KVR Loans**

56. On May 1, 2007, Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris unanimously approved both an $8.25 million ADC loan to KVR for a 44,000 square-foot retail development in Aurora, Illinois, along with a $400,000 line of credit to KVR for the same project. The identified primary repayment sources for the loan were "interest reserve/cash flow from rental income or end loan refinancing," with a secondary recourse to the sole guarantor, who was the principal of KVR. The loans were "undesirable" under Benchmark's Loan Policy because the borrower was a "new enterprise," and repayment was solely dependent upon the

entity's profitability.  The Bank had no prior relationship with KVR's principal, whose unverified assets were located in India.  The borrower and guarantor provided stale financial information.

57.     The collateral for the loan was four unconstructed commercial lots on which the retail space was to be built.  The KVR lots were appraised with an "as is" market value of $6,055,000, which had a corresponding LTV ratio of 145 percent, and a prospective market value of $13,080,000 resulting in an LTV ratio of 70 percent.  The loan package cited the prospective market value with the LTV ratio of 70 percent, which was the projected value for the completed and rentable retail space.  Unlike in a sub-division development where lots can be sold in stages, the KVR project required all phases of the development and construction to be completed for the borrower to realize any return, which in turn meant that the loans to KVR would need to be fully funded for the project to have a chance of success.

58.     These May 2007 loans were nearly double the Bank's lending limit to one borrower, which meant the loans could not be made unless other banks participated in the credit.  Phased construction, as contemplated in the project plan, was not possible and would have required amounts beyond the Bank's lending limit to be advanced.  Yet, Defendants approved the loans without participations in place.  Although some participation was eventually obtained, full participation was never secured.  In addition, this project was entirely speculative, with no signed lease agreements.  To provide additional funds for the same project, several loans were made personally to Borrower A, the husband of KVR's principal.  In August 2007, the DLC approved a "new commercial mortgage" in the amount of $656,926 to KVR, but this loan was never made to KVR.  Instead, Officers Samuelson and Medernach converted the loan to a personal loan to Borrower A in the increased amount of $700,000, which was then approved by

only Samuelson and Medernach on January 1, 2008. Two additional loans of $725,000 and $75,000 to Borrower A were similarly authorized jointly by Samuelson and Medernach, on January 18, 2008 and April 11, 2008, respectively, ostensibly under their combined lending authority of $1.5 million. Because all three loans were actually for the KVR project, they should have been approved by the DLC, as the aggregate loans to KVR already exceeded Samuelson's and Medernach's combined authority.

59.     When the Bank was unable to fund the KVR project fully due to the lack of participations, and KVR was unable to pay the general contractor, Wegman Construction ("Wegman"), for work it had performed, Medernach devised a plan to create the appearance of a participation. Medernach's plan involved entering into a "participation" agreement with Wegman for $1.7 million of the KVR loans, and then lending Wegman the funds for Wegman's portion of the participation. In connection with this plan, Defendants Samuelson, DePaulo, Hansen, Kelley, and Norris approved a loan to Wegman "for Purchase of KVR Participation" by email on June 25, 2008. On June 12, 2008, two weeks before the loan to Wegman was approved, Benchmark and Wegman entered into a participation agreement listing "R C Wegman Construction Company, Inc." as the participating lender, and "R C Wegman Construction Company (KVR Properties LLC)" as the borrower. Medernach signed the participation agreement for Benchmark. The Bank subsequently funded an additional $1.7 million of the KVR loans, which were then paid to Wegman. These were only paper transactions, with no funds actually transferring, other than the construction loan draw used to pay Wegman. None of the Defendants raised any concerns about the structure of the transaction when it was presented for approval.

60.     The deficient underwriting, inadequate information, and lack of credit analysis were apparent from the loan packages provided to the Defendants.  Had the Defendants on these loans insisted on the required underwriting and credit analysis, it would have demonstrated, among other things, that there was no adequate sources of repayment, the repayment sources identified were speculative and vulnerable to a deteriorating commercial real estate market, the borrowers' creditworthiness did not support the loan amounts, and the loans should not have been approved.

61.     The KVR loans matured in March 2009, and borrowers made no payments.  The Bank took a deed in lieu of foreclosure on June 1, 2009.  The identified repayment sources were insufficient to repay the loan.

62.     As a result of the actions and inactions of Defendants Samuelson, DePaulo, Hansen, Kelley, Norris, and Medernach with respect to the KVR loans, Benchmark and the FDIC-R incurred damages in excess of $3.6 million.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence (Illinois law)
### [IN THE ALTERNATIVE TO COUNT III]

63.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-62 above as if fully set out in this Count.

64.     Defendants Samuelson and Medernach, as Officers and Directors of the Bank, and Defendants DePaulo, Hansen, Kelley, and Norris, as Directors of the Bank, owed duties to conduct the Bank's business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

A.     Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

B.     Approving only those loans that conformed to the Bank's own lending policies;

C.     Approving only those loans that conformed to safe and sound lending practices;

D.     Ensuring that loans approved were soundly underwritten; and

E.     Ensuring that loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank.

65.     Defendants breached their duties and were negligent by voting to approve one or more of the ADC/CRE loans identified in the chart in ¶ 30 above, because they knew, or should have known:

A.     Samuelson had originated and recommended the loan or loans without subjecting them to an independent credit review;

B.     The Chicago-area ADC/CRE market was in decline;

C.     Benchmark was already over-exposed to ADC/CRE risk and had insufficient loan loss reserves to cushion against that risk; and/or

D.     Each such loan involved one or more of the following characteristics, which increased the risk of default:

(1)     A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(2)     Insufficient proof of pre-sales or pre-rentals and/or necessary market demand;

(3)     Insufficient collateral; and

(4)     Insufficient participation from other banks.

66.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT II
### Gross Negligence – Violation of 12 U.S.C. §1821(k)

67.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-62 above as if fully set out in this Count.

68.     Defendants Samuelson and Medernach were Officers and Directors of the Bank. Defendants DePaulo, Hansen, Kelley, and Norris were Directors of Benchmark. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds such directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law. Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

69.     Defendants Samuelson, DePaulo, Hansen, Kelley, Norris, and Medernach owed duties to the Bank to conduct its business consistent with safe and sound lending practices. These duties included, but were not limited to, the following:

A.     Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

23

B.      Approving only those loans that conformed to the Bank's own lending policies;

C.      Approving only those loans that conformed to safe and sound lending practices;

D.      Ensuring that loans approved were soundly underwritten; and

E.      Ensuring that loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank.

70.      Defendants breached their duties and were grossly negligent by voting to approve one or more of the ADC/CRE loans identified in the chart in ¶ 30 above, because they knew, or should have known:

A.      Samuelson had originated and recommended the loan or loans without subjecting them to an independent credit review;

B.      The Chicago-area ADC/CRE market was in decline;

C.      Benchmark was already over-exposed to ADC/CRE risk and had insufficient loan loss reserves to cushion against that risk; and/or

D.      Each such loan involved one or more of the following characteristics, which increased the risk of default:

(1)      A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(2)      Insufficient proof of pre-sales or pre-rentals and/or necessary market demand;

(3)      Insufficient collateral; and

(4)      Insufficient participation from other banks.

71. As a direct and proximate result of Defendants' gross negligence, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT III
### Breach of Fiduciary Duty (Illinois law)
### [IN THE ALTERNATIVE TO COUNT I]

72. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-62 above as if fully set out in this Count.

73. Defendants Samuelson and Medernach, as Officers and Directors of the Bank, and Defendants DePaulo, Hansen, Kelley, and Norris, as Directors of the Bank, owed the Bank fiduciary duties to act with the utmost care and in the best interests of the Bank. These duties included, but were not limited to, the following:

A. Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

B. Approving only those loans that conformed to the Bank's own lending policies;

C. Approving only those loans that conformed to safe and sound lending practices;

D. Ensuring that loans approved were soundly underwritten; and

E. Ensuring that loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the risk of loss to the Bank.

74. Defendants breached their fiduciary duties by voting to approve one or more of the ADC/CRE loans identified in the chart in ¶ 30 above, because they knew, or should have known:

25

      A.        Samuelson had originated and recommended the loan or loans without subjecting them to an independent credit review;

      B.        The Chicago-area ADC/CRE market was in decline;

      C.        Benchmark was already over-exposed to ADC/CRE risk and had insufficient loan loss reserves to cushion against that risk; and/or

      D.        Each such loan involved one or more of the following characteristics, which increased the risk of default:

      (1)      A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

      (2)      Insufficient proof of pre-sales or pre-rentals and/or necessary market demand;

      (3)      Insufficient collateral; and

      (4)      Insufficient participation from other banks.

75.     As a direct and proximate result of Defendants' breaches of fiduciary duties, Plaintiff suffered damages in an amount to be determined at trial.

WHEREFORE, the Federal Deposit Insurance Corporation as Receiver for Benchmark Bank demands a trial by jury and judgment in its favor and against the Defendants, as follows:

      A.        Determining the amount of damages caused by Defendants;

      B.        Determining the amount of accrued interest (including pre-judgment interest) on such damages;

      C.        Awarding the FDIC-R the full amount thereof;

      D.        Awarding the FDIC-R its costs and other expenses incurred by it in connection with this proceeding; and

E. Granting the FDIC-R such other and further relief as this Court may deem just and proper under the circumstances.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
BENCHMARK BANK**

Dated: October 2, 2012                        /s/ Susan Valentine
                                              One of its Attorneys

Susan Valentine (ARDC No. 6196269)
Lydia A. Bueschel (ARDC No. 6274638)
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
svalentine@robinsoncurley.com
lbueschel@robinsoncurley.com